**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 24-cv-3245-CNS-NRN

MICKEY WALKER,

      Plaintiff,

v.

HALEY BOURDON, *in her individual capacity*,
CITY OF LAKEWOOD, COLORADO.

      Defendants.

---

**[PROPOSED] THIRD AMENDED COMPLAINT AND JURY DEMAND**

---

      Plaintiff Mickey Walker ("Mickey"), by and through his attorney, Aaron Slade of Novo Legal Group, L.L.C., hereby submits his Second Amended Complaint against Haley Bourdon ("Officer Bourdon") and the City of Lakewood, Colorado, and in support thereof states as follows.

**<u>INTRODUCTION</u>**

      Mickey Walker experienced a life-threatening medical emergency when he suffered a severe hemorrhagic stroke on the evening of November 19, 2022. A malformation of the blood vessels in his brain burst, causing blood to hemorrhage, collect, and clot inside of his brain. This sort of internal brain bleeding and clotting causes permanent brain damage and can be fatal if not immediately treated. Mickey exhibited all of the textbook signs of a serious stroke that night, including a severe headache, complete paralysis of the left side of his body, slurred and delayed speech, loss of balance, inability to walk without a severe left-sided limp, left-sided facial

drooping, drooling out of his mouth, and mental confusion. Luckily, within minutes of his stroke starting, a security guard found Mickey and called 911.

Officer Haley Bourdon of the Lakewood Police Department responded to the call. Instead of helping Mickey, Officer Bourdon deliberately, unreasonably, and unconstitutionally disregarded the obvious and apparent signs that Mickey was suffering a serious medical emergency, insisting that Mickey was merely drunk or intoxicated. Officer Bourdon viewed Mickey not as a citizen in need of assistance but as a criminal who needed to be prosecuted, and nothing else. For nearly an hour, Officer Bourdon acted with no urgency and insisted that she take Mickey to a local fire station for a blood draw to support a pending DUI charge against him instead of taking him to a hospital, all while the blood in Mickey's brain continued to collect and clot causing irreparable damage.

Upon the urging of another Lakewood Police Officer, Officer Bourdon finally transported Mickey to a local hospital. Within seconds after his arrival, the hospital staff signaled a stroke alert and rushed Mickey to an emergency neurology evaluation and craniotomy.

Mickey suffered needlessly for nearly an hour while Officer Bourdon refused to take him to emergency medical care. The untreated stroke caused permanent damage to Mickey's brain, including ongoing weakness and paralysis in his left arm and an inability to ambulate fully. Upon information and belief, the stroke would have caused far less brain damage and permanent disability if Officer Bourdon had provided Mickey timely access to emergency medical care. Mickey files this lawsuit seeking vindication of his rights and redress for his harms.

## JURISDICTION AND VENUE

1.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367.

2.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1).

## PARTIES

3.      At all relevant times, Plaintiff Mickey Walker resided within the District of Colorado.

4.      Upon information and belief, at all relevant times Defendant Haley Bourdon resided in the District of Colorado.

5.      At all relevant times, Defendant Haley Bourdon was an employee, agent, and police officer of the City of Lakewood Police Department acting within the scope of her employment and under color of state law.

6.      Defendant City of Lakewood is a municipality and local government entity located within the District of Colorado. The Lakewood Police Department is a government service provided by the City of Lakewood. Defendant City of Lakewood employed defendant Haley Bourdon, and Haley Bourdon's actions during the events that give rise to this Complaint were taken within the scope of her employment.

## FACTUAL ALLEGATIONS

7.      On November 19, 2022, Mickey Walker was a healthy 37-year-old man with no significant health problems.

8.      Mickey worked as an assistant manager at America's Best Contacts and Eyeglasses.

9.      In addition to his work, Mickey was looking forward to going back to school to finish his degree and start work in mental health counseling.

10.     Mickey was also an avid and skilled bowler. He had competed in various local bowling leagues and competitions since he was in middle school.

11.     Mickey lived in an apartment with some roommates in Arvada, Colorado.

12.     That evening, Mickey had plans to meet up with an acquaintance named Jonathan later that night. Jonathan and Mickey had met a few times before, and had a formed a casual, romantic relationship.

13.     At around 5:30PM, after finishing work for the day, Mickey made a cup of coffee with two shots of rum in it. Other than the single cup of coffee with the two shots of rum in it, Mickey had no other alcohol that evening.

14.     Around that same time, Mickey also smoked some marijuana.

15.     At approximately 6:30PM Mickey drove to Jonathan's apartment which was in nearby Lakewood, Colorado.

16.     While at Jonathan's apartment, Jonathan offered Mickey some marijuana to smoke out of a glass pipe. Mickey took one or two hits from Jonathan's pipe.

17.     Upon information and belief, Jonathan put methamphetamine in the pipe in addition to the marijuana before giving it to Mickey.

18.     Mickey did not know Jonathan had apparently laced the marijuana with methamphetamine. Mickey would have refused to smoke the methamphetamine if he had known about it.

19.     Mickey stayed with Jonathan in his apartment for several hours. Mickey did not consume any alcohol with Jonathan while he was there.

***Mickey suffers a severe hemorrhagic stroke.***

20.     At around 10:30PM, still in Jonathan's apartment, Mickey suddenly felt a severe, sharp headache.

21.     Mickey does not usually have headaches. This headache pain was the worst he had ever experienced; it felt like his head was going to explode.

22.     Mickey asked Jonathan for some Tylenol and some water to drink, which Jonathan provided.

23.     Mickey stood up and walked to the bathroom in Jonathan's apartment. However, while in the bathroom, Mickey collapsed and fell forward onto the floor.

24.     At this point, in addition to the intense headache, Mickey felt very confused. He spoke slower than usual, the left side of his face was drooping, and he had complete paralysis throughout the left side of his body.

25.     As a result, Mickey had complete inability to move his left leg, arm, or hand.

26.     Jonathan helped Mickey stand up. Mickey tried to dress himself to leave but had difficulty buttoning his jeans because of his confusion, pain, and left-sided paralysis.

27.     Mickey did not yet know that he was experiencing a severe stroke, potentially caused by the methamphetamine Jonathan gave him without him knowing. An abnormal connection in the arteries and veins in his brain, called an Arteriovenous Malformation, had hemorrhaged, causing his brain to bleed internally.

28.    Serious and potentially permanent brain damage can result from a hemorrhagic stroke due to the increased pressure of blood collecting in the brain and associated brain swelling.

29.    In addition to the elevated risk of serious and permanent brain damage, if hemorrhagic strokes are not immediately treated, the blood collecting in the brain can clot, which can deny crucial oxygen to parts of the brain and cause further permanent damage.

30.    Untreated hemorrhagic strokes can be fatal.

31.    As a result of the above, a hemorrhagic stroke is a medical emergency that requires immediate medical intervention. Any delay in treatment can dramatically affect the level of permanent brain damage caused by the stroke, and increases the risk of death.

32.    Instead of helping Mickey or calling 911, Jonathan ushered Mickey out of his apartment, hastily led Mickey to his car, and left him sitting in the driver seat.

33.    While Jonathan led Mickey to his car, a private security guard named Anthony observed them.

34.    Anthony approached Mickey and Jonathan and asked what was going on. Jonathan lied to Anthony and told him that he did not know Mickey. After speaking with Anthony and leaving Mickey in his car, Jonathan rushed back up to this apartment and locked the door behind him.

35.    Mickey, stranded and still suffering the symptoms of the stroke, felt confused and did not know what to do. He started the car's engine to remain warm from the cold outside.

36.    All Mickey wanted to do was go home and feel better.

37.    Mickey did not have the capacity to drive because of his stroke. However, the confusion caused by the stroke prevented him from understanding his incapacity or what was happening to him.

38.    Anthony observed Mickey and immediately understood something was seriously wrong. In response, Anthony called 911.

39.    Anthony told the dispatcher that he thought Mickey was extremely intoxicated and that both alcohol and drugs may have been involved. When asked by the dispatcher why Anthony believed Mickey was intoxicated, Anthony said that Mickey was stumbling, could barely walk, his pants were down, that he urinated on himself, and that he had "stuff coming from his mouth."

40.    Anthony also told the dispatcher that Mickey was cooperative and had no weapons on him.

41.    Officers Haley Bourdon and Daniel Prien from the Lakewood Police Department responded to the call from dispatch.

42.    Officer Bourdon responded first, and contacted Mickey at around 11:08PM on November 19, 2022—approximately 15 minutes after Anthony had called 911.

43.    Officer Bourdon, upon information and belief, had primary decision-making authority over Mickey, including his arrest, detention, placement, and what medical care he received.

44.    As explained in detail below, throughout her contact with Mickey that night, Officer Bourdon deliberately and unreasonably disregarded the obvious and apparent signs that Mickey was suffering a serious medical emergency and refused to provide him timely and appropriate medical care.

45.     Instead, Officer Bourdon only viewed Mickey as a criminal that needed to be prosecuted, and nothing else.

***Officer Bourdon deliberately and unreasonably ignores Mickey's serious and obvious need for emergency medical care.***

46.     Officer Bourdon arrived on scene first, and approached Anthony and Mickey. Mickey still sat in the driver's seat of his car with the engine running.

47.     Officer Bourdon told Mickey to turn his car off, and when he was unable to, she reached into the car and did it for him.

48.     Officer Bourdon asked Mickey for his driver license. Mickey attempted to get his wallet out of his pocket, but he had difficulty doing so because he had no ability to move his left hand due to the severe stroke he was experiencing.

49.     Within seconds of Officer Bourdon's contact with Mickey, it was apparent and obvious that Mickey was only able to move his right hand and not his left.

50.     Officer Bourdon asked Mickey if he knew where he was, to which Mickey replied "Arvada."

51.     In response, Officer Bourdon corrected Mickey and told him that he was in fact in Lakewood, not Arvada.

52.     While Mickey spoke with Officer Bourdon, his speech was slurred, and his response times delayed.

53.     Officer Bourdon asked Mickey why his pants were down. Mickey said he had been in the restroom, and that he had trouble standing up.

54.     Officer Bourdon then told Mickey that he smells like "a lot of alcohol" and asked him if he had drank a lot that night.

8

55.     Officer Bourdon had no factual basis to support her suspicion that Mickey smelled like he drank a lot of alcohol that night.

56.     Mickey told Officer Bourdon that he had not had anything to drink besides the two shots of rum he had in his coffee several hours earlier that evening.

57.     Officer Bourdon observed Mickey's eyes were dilated and asked him why. Mickey replied that he had also smoked some weed earlier that evening.

58.     Officer Bourdon then observed that Mickey was "spitting up on himself." Mickey was drooling out of his mount and onto his shirt.

59.     When Officer Bourdon asked Mickey if he had done any other drugs that night, he said no.

60.     Officer Bourdon told Mickey to step out of his car and stand up. Mickey tried to move his legs out from the car to stand up but could not do so because of his stoke-induced left-sided paralysis.

61.     Officer Bourdon pulled Mickey up and out of his car and observed his inability to balance or stand firmly. Mickey's pants were still unbuttoned, and they fell to his ankles as Officer Bourdon pulled him out of his car.

62.     Officer Bourdon noticed Mickey stumbling forward after she pulled him out of the car. At no point did Officer Bourdon assist Mickey to help him button his pants.

63.     Mickey told Officer Bourdon that he felt "a little weak."

64.     At this point, Officer Prien arrived on scene. He observed Officer Bourdon pushing Mickey forward and asking him to walk on his own. Mickey, however, was still unable to walk because of his left-sided paralysis.

65.    Mickey's mobility impairments were so noticeable that Officer Prien stopped Mickey and asked, concerned, "Can you walk?"

66.    Before Mickey could answer, Officer Bourdon grabbed Mickey's arms, pulled them behind his back, and put his wrists into handcuffs.

67.    Officer Bourdon told Mickey that she was placing him in custody for DUI. She and Officer Prien then pushed and shoved Mickey over to her patrol car, demanding that he walk on his own.

68.    While the officers pushed Mickey forward, Officer Prien pulled Mickey's pants up, but did not assist him to button them.

69.    Both officers observed Mickey's complete inability to walk—he exhibited a severe left-sided limp and was stumbling and as the officers pushed him forward.

70.    Officer Prien, concerned, asked Mickey why he was limping and if he normally walks with a limp.

71.    Mickey responded that he was not hurt and that he does not normally walk with a limp.

72.    Mickey continued to struggle to walk as the two officers ushered him over to the Officer Bourdon's patrol car.

73.    Mickey's pants, still unbuttoned, fell to his ankles again as the officers pushed him over to the car.

74.    Once at the patrol car, Officer Bourdon searched Mickey's pockets and confiscated his belongings.

75.    While emptying Mickey's pockets, Officer Bourdon said that Mickey was acting "really weird."

76.    After Officer Bourdon finished her search of Mickey's pockets, Officer Prien pushed him into the back seat of Officer Bourdon's patrol car. Mickey had to hop on his right leg to keep his balance while the officers pushed him.

77.    Because Mickey had no ability to use the left side of his body, he was unable to climb into the back seat. Both officers shouted at him to sit in the car even though it was obvious that he could not.

78.    Officer Bourdon pushed Mickey's legs into the back of the car, causing Mickey to lose his balance and fall on his side on the back seat.

79.    Officer Bourdon then pulled Mickey upright and observed Mickey frantically grabbing onto his left hand with his right hand behind his back.

80.    Officer Bourdon asked, "Are your fingers cold? Is that why you are doing that?"

81.    Mickey replied by asking whose hand he was grabbing, showing the officers that he had complete left-sided paralysis and no feeling at all in his left arm and hand.

82.    Officer Prien told Mickey that he was grabbing his own hand. Mickey continued to look confused and worried.

83.    Even with the officers pushing Mickey into the back seat and pulling him upright, Mickey's left leg lay motionless over his right, and he was unable to pull his legs fully into the vehicle.

84.    The officers still did not assist Mickey with buttoning his pants and left him sitting in the back seat with his pants around his thighs.

85.    The officers shined their flashlight on Mickey's face and could see that the left side of his face was drooping.

86.    Mickey asked if his left arm was stuck on something because he could not feel nor move it as he tried to sit up straight. Officer Bourdon ignored Mickey's concern and told him that the reason he was struggling was that he was handcuffed and that it was uncomfortable to sit in the back seat with handcuffs.

87.    Officer Bourdon read Mickey his Miranda rights, and Mickey exercised his right to remain silent.

88.    Officer Bourdon asked Mickey if he would consent to a blood draw pursuant to the DUI charge. Mickey agreed.

89.    Officer Bourdon tried to close the rear door of her patrol car, but Mickey's left foot was still laying lifeless on the edge of the door jam. Officer Bourdon asked Mickey to bring his leg into the car, but he could not do so—as he continued to suffer from obvious left-side paralysis. Officer Bourdon, however, just shoved his left foot into the back of the car before closing the door.

90.    Officer Prien observed Mickey in the back seat while Officer Bourdon spoke with Anthony, the security guard, about what he had observed.

91.    For several minutes, Mickey languished in pain and confusion in the back of Officer Bourdon's patrol car while she investigated the DUI charge against him.

92.    For every minute that the officers made Mickey wait, he suffered needlessly in pain and confusion.

93.    Furthermore, during each passing minute, Mickey's brain continued to internally hemorrhage blood, causing damage and increasing his risk of death.

94.     When Officer Bourdon returned to the patrol car, Officer Prien immediately drew Officer Bourdon's attention to how much Mickey was drooling on himself while sitting in the back seat. In response, Officer Bourdon said, "I know."

95.     Officer Prien, again concerned, told Officer Bourdon that Mickey was "more hospital than anything" and that he "would take him to the hospital" if it was his choice.

96.     In response, Officer Bourdon dismissed Officer Prien's concerns and simply stated, "Well, he needs a blood draw," presumably for the DUI charge she was investigating.

97.     In apparent recognition of Mickey's serious need for medical attention, Officer Prien persisted, saying "I would have paramedics give you their opinion on what he needs to do."

98.     At this point in Officer Bourdon's investigation, she had enough information to conclude that Mickey was not intoxicated, but rather experiencing a severe medical emergency. Mickey presented with textbook signs of a serious stroke, including complete paralysis of the left side of his body, slurred and delayed speech, loss of balance, inability to walk without a severe left-sided limp, left-sided facial drooping, drooling out of his mouth, and mental confusion.

99.     Moreover, Mickey's presentation was entirely inconsistent with a person who had consumed two shots of alcohol and smoked marijuana hours earlier.

100.     Regardless, Officer Bourdon insisted that she take Mickey to a local fire station for a blood draw so she could pursue a DUI charge against him, delaying crucial care that would have prevented Mickey's continued suffering and, upon information and belief, prevented or lessened serious brain damage caused by the untreated stroke.

***Officer Bourdon delays Mickey's access to emergency medical care by an additional twenty-four minutes by taking him to get his blood drawn instead of immediately bringing him to a hospital for treatment.***

101.    Officer Bourdon arrived at the fire station just after 11:30PM. For nearly an hour at this point, Mickey's brain had been internally hemorrhaging blood causing irreparable damage, pain, and confusion.

102.    The two officers acted with no urgency as Mickey suffered in pain and confusion in the back of the patrol car. The officers did not immediately take Mickey out of the car to be seen by the firefighter paramedics and did not get him any medical attention.

103.    Officer Prien opened the door to Officer Bourdon's patrol car to talk to Mickey. Officer Bourdon stood next to Officer Prien and observed their conversation.

104.    Officer Prien asked Mickey why he was drooling all over himself, if he was suffering a medical emergency, and if he needed to see a doctor. Mickey did his best to answer his questions despite the pain and confusion he was experiencing as a result of the stroke. As such, Mickey was able to reply feebly that he did not know what was happening to him and that he had a headache.

105.    It took the officers over three minutes until they finally told Mickey to get out of the patrol car and walk into the fire station.

106.    For every minute that the officers made Mickey wait, he suffered needlessly in pain and confusion.

107.    Furthermore, during each passing minute, Mickey's brain continued to internally hemorrhage blood, causing damage and increasing his risk of death.

108.    As Mickey tried to get out of the back seat of the car, his left leg caught on the edge of the door because he still had complete left-sided paralysis. Mickey immediately stumbled and could not stand up straight.

109.    Officer Prien pushed Mickey forward towards the entrance of the fire station while Officer Bourdon followed immediately behind them. Mickey again exhibited a severe left-sided limp and stumbled as Officer Prien pushed him forward.

110.    As Officer Prien continued to push Mickey towards the entrance, he told Mickey, "You remind me of a zombie the way you are walking," mocking the severe stroke he was suffering.

111.    Officer Prien and Mickey entered the garage of the fire station and Officer Prien announced shamefully to the paramedics and fire department staff, "We got a zombie right now!"

112.    Officer Prien continued pushing Mickey forward and said that if he could cast Mickey to play a zombie on an episode of the Walking Dead, he would.

113.    Mickey's left-sided paralysis, left-sided limp that impaired his ability to walk, and left-sided facial droop were all even more apparent and obvious in the bright light of the fire station garage.

114.    Officer Prien sat Mickey down in a chair, and Mickey said that he felt weak.

115.    Officer Bourdon told one of the paramedics that Mickey was acting "really weird" and that he kept "spitting on himself."

116.    Officer Prien asked one of the paramedics if they could "check his vitals" in addition to collecting a sample of his blood for the DUI charge.

117.    Officer Bourdon stood next to Officer Prien while he talked with the paramedics.

118.    Neither Officer Bourdon nor Officer Prien informed the paramedics of any of the other serious symptoms Mickey had been exhibiting throughout their encounter with him that night.

15

119.    Officer Prien told Officer Bourdon that in his view, Mickey should go "straight to detox" as opposed to jail because of the symptoms Mickey was exhibiting—again drawing Officer Bourdon's attention to the serious nature of Mickey's presentation.

120.    Mickey told the paramedic who took his vitals that he was having a headache but that he had not fallen that night and had not injured his head.

121.    Mickey started to fall over in his chair. Officer Prien had to sit him back up as the paramedic continued to ask him questions.

122.    Mickey told the paramedic that he does not have any serious medical problems or history.

123.    While the paramedic continued to take Mickey's vitals, Officer Prien told Officer Bourdon that Mickey should be taken to a hospital after the blood draw because "detox will refuse him."

124.    Mickey told the paramedic that he felt a little weird and that he felt weak.

125.    Mickey said that he had smoked marijuana and drank alcohol together in the past, but that those substances had never made him feel like he was feeling that night.

126.    The paramedic took blood from Mickey's arm for the DUI charge.

127.    While Mickey spoke with one of the paramedics and Officer Prien, Officer Bourdon called her supervisor and told him that Mickey was acting "really weird", had been "grabbing for his cuff" even though there was nothing wrong with his cuffs, could not walk, and that he could not stand up on his own. She informed her supervisor that she would not book Mickey into jail and would take him to "detox" or the hospital.

128.    After the paramedic finished collecting a sample of Mickey's blood, Officer Prien stood Mickey up and told him to button his pants now that he no longer had handcuffs on. Officer Bourdon walked over to Mickey and observed him attempt to button his pants.

129.    Mickey tried to button his pants with only his right hand.

130.    Officer Prien, gesturing to Mickey's left hand, told him his left arm "works," and asked him why he was not using it to button his pants.

131.    Officer Bourdon simply stared at Mickey, watching him struggle.

132.    Officer Prien asked Mickey if his left arm worked. In response, Mickey mumbled "it hurts."

133.    Officer Prien lifted Mickey's left arm up and shook it, yelling at Mickey, "you have a second hand!"

134.    When Officer Prien let go of Mickey's left arm, it fell lifelessly to his side.

135.    Mickey continued to struggle, trying to button his pants with just his right hand.

136.    Officer Prien again grabbed Mickey's left arm, held it to his pants, and ordered Mickey to button them. As soon as Officer Prien let go of his left arm, it again fell lifelessly to his side.

137.    Officer Prien tried a third time, and grabbed Mickey's left arm saying, "Why can't you use this arm?" Mickey did not respond. Then, just like before, when Officer Prien let go of his left arm, it fell to his side motionless.

138.    Neither Officer Bourdon nor Officer Prien helped Mickey button his pants.

139.    Officer Bourdon observed the entirety of Mickey's behavior yet again disregarded the serious and concerning symptoms Mickey was exhibiting.

140.    Officer Prien put handcuffs back on Mickey and pushed him towards the exit of the fire station.

141.    Officer Prien could not resist a final opportunity to mock Mickey while he suffered from his stroke, announcing loudly, "Do your zombie walk my man!" as he shoved him forward.

142.    Officer Bourdon stood on the other side of Mickey and laughed at Officer Prien's callous joke.

143.    Once outside, the officers ordered Mickey to climb into the back of the patrol car. When Mickey could not, the officers shoved him in.

144.    As Officer Prien walked to his patrol car, Officer Bourdon shouted that she was going to "do some paperwork"—suggesting that she was going to have Mickey wait instead of immediately transporting him to the hospital, and further evidencing her utter lack of urgency in responding to Mickey's serious medical needs.

145.    Officer Bourdon did not start driving Mickey to the hospital until 11:54PM—meaning that she had delayed Mickey's medical care by at least twenty four additional minutes while she took him for a blood draw to support the DUI charge she was investigating instead of bringing him immediately to the hospital after first contacting him.

146.    Because of Officer Bourdon's failures, Mickey's brain bled internally for another twenty four minutes causing irreversible damage, pain, and confusion.

***Officer Bourdon fails to act with any urgency when transporting Mickey to the Emergency Room.***

147.    Officer Bourdon drove Mickey to the Lutheran Hospital Emergency Room in Wheat Ridge, Colorado while Officer Prien followed behind.

148.    Throughout the drive, Officer Bourdon continued to act without any sense of urgency towards Mickey's medical emergency. Officer Bourdon did not use her lights or sirens while transporting Mickey to the hospital.

149.     As Officer Bourdon arrived at the emergency department at Lutheran Hospital, she took a phone call and discussed an unrelated case as Mickey continued to suffer in the back seat.

150.    Officer Prien arrived shortly after Officer Bourdon and pulled Mickey out of the back of the patrol car.

151.    Officer Prien and Officer Bourdon again pushed Mickey forward, forcing him to walk despite his obvious inability to use his left leg.

152.    The officers forced Mickey forward so quickly that he tripped over a curb.

153.    Mickey's pants again fell around his ankles as the officers shoved him forward toward the entrance of the emergency department.

154.    A member of the hospital staff rushed out to help Mickey inside and put him onto a stretcher.

155.    Mickey was admitted to the hospital at approximately 12:07AM. He had been in Officer Bourdon's custody for nearly an hour, and had been suffering a severe hemorrhagic stroke for nearly an hour and a half.

156.    Officer Bourdon told the hospital staff that Mickey was here "for detox."

***Within seconds of Mickey's arrival at the Emergency Room, hospital staff immediately recognize he is suffering a severe stroke.***

157.    While the hospital staff rushed around Mickey, Officer Prien told the hospital staff that for "some reason" Mickey's left side "does not cooperate" and that Mickey had "forgotten" how to use the left side of his body.

158.    A nurse examined Mickey and observed that he had no function in the left side of his body.

159.    Mickey continued to drool out of his mouth.

160.    Within seconds the hospital staff issued an emergency stroke alert calling additional medical staff to the entrance of the emergency room.

161.    Officer Bourdon told the medical staff that Mickey had been presenting similarly since she first contacted him at around 11:15pm.

162.    Officer Prien lied to the medical staff telling them that Mickey was "moving everything" while he had been at the fire station.

163.    While Officer Prien spoke to the medical staff and conveyed incorrect information to them, Officer Bourdon stood by and watched, doing nothing.

164.    One of the physicians asked Officer Prien if Mickey had been acting similarly when they first contacted him. In response, Officer Prien lied again and said "no."

165.    Officer Prien told the physician that up until that point, Mickey could walk, but they had to "help him walk."

166.    Officer Prien lied again to the medical staff and told them, when they first contacted Mickey at his car earlier that night, Mickey "was good" and "was walking."

167.    Officer Prien told the medical staff that they had taken Mickey to the fire station and had asked paramedics to check his vitals because he was "acting weird." The nurse clarified what Officer Prien meant by that statement, and asked, "like not just drunk?"

168.    Officer Prien replied and said, "Yeah, I thought there was something."

169.    Officer Prien told the medical staff that Mickey was not nearly as bad when he was at the fire station.

170.    Officer Prien said that Mickey had been acting "normal" and was "just drunk."

171.    One of the medical staff asked officer Bourdon if she had actually breath-tested Mickey as part of her investigation to confirm if he was drunk or not. Officer Bourdon said, "no" and explained that they only took Mickey for a blood test.

172.    Officer Bourdon covered her body-worn camera while she spoke to the medical staff.

173.    Officer Bourdon then hurriedly walked to her car to write Mickey a citation for DUI instead of staying to answer the medical providers' questions or recording the conversation with the medical providers.

174.    Officer Prien stayed standing next to Mickey.

175.    While doctors and nurses rushed around Mickey providing him emergency medical care, one of the physicians relayed what Officer Prien had said earlier, saying "when they contacted him, he wasn't doing anything of this."

176.    The physician then looked over at Officer Prien to confirm whether that was true. Officer Prien then changed his story and said, "he was like this" when they first contacted Mickey, that he did not do a "normal DUI investigation," and that he thought Mickey should go to the hospital.

177.    Mickey then sat up suddenly in the stretcher and vomited.

178.    After sitting in her car completing Mickey's DUI paperwork, Officer Bourdon returned to the emergency room entrance.

179.    Officer Prien walked over to Officer Bourdon and told her that he had known there was "something weird" and that Mickey was "not a normal DUI."

180.    Officer Bourdon did not say anything.

181.    Officer Bourdon and Officer Prien then left the hospital.

***The State of Colorado dismisses Mickey's DUI charge.***

182.    Officer Bourdon formalized the DUI charge against Mickey, but in the months following his arrest, Mickey fought to clear his name.

183.    Mickey received assistance from the Colorado Public Defender's office to defend against the criminal charges against him; however, Mickey was not able to secure legal counsel until on or around March 8, 2023.

184.    Eventually, in July 2024, the district attorney prosecuting his case dismissed all charges against Mickey, clearing him of any wrongdoing.

***Mickey's damages and permanent disability.***

185.    Mickey suffered needlessly for nearly an hour while Officer Bourdon refused to provide him access to emergency medical care for the severe stroke he was experiencing.

186.    During that hour, Mickey was confused, in pain, and scared.

187.    Officer Bourdon pushed and shoved Mickey forward when it was obvious he was unable to walk and pulled him in and out of her patrol vehicle—exacerbating the pain, stress, and mental anguish Mickey was suffering.

188.    Officer Bourdon subjected Mickey to needless embarrassment as she pushed and shoved him without helping him button his pants, causing his pants to frequently fall down around his ankles throughout his arrest and transportation.

189.     Officer Bourdon refused to take Mickey's handcuffs off even though she observed him being unable to sit in the back seat properly or comfortably because of his left-sided paralysis.

190.     A scan of Mickey's brain taken immediately after his arrival at the hospital revealed that a significantly large hematoma—a collection of blood—had formed in the right side of his brain.

191.     The hemorrhaged blood had also begun to clot, denying crucial oxygen to parts of his brain, and, upon information and belief, further exacerbated the permanent damage to Mickey's brain.

192.     Soon after Mickey's arrival at the hospital, he underwent an emergency craniotomy to drain the hematoma.

193.     Mickey was hospitalized for seventeen days following his emergency craniotomy. During that time, Mickey was bed-ridden, could not eat on his own, and had a feeding tube placed.

194.     In the weeks following his surgery, Mickey could not see out of the peripheral side of his left eye and continued to suffer complete paralysis of the left side of his body.

195.     After his surgery, Mickey continued to say things that did not make sense, and had cognitive problems.

196.     Mickey did not have the insight to understand his condition. For example, on one occasion Mickey tried to get out of his hospital bed to smoke a cigarette, not realizing that he couldn't move the left side of his body, and he fell to the floor out of the hospital bed.

197.     During the seventeen days in the hospital, Mickey had various family members come and visit him, but he didn't remember those people coming to visit him.

198.    Mickey's mother, Johnnie Walker, stayed with Mickey throughout his hospital stay. Johnnie saw a summons for a DUI left for Mickey from the Lakewood Police but no other information about the contact he had with the police was there.

199.    After his discharge from the hospital, Mickey was immediately transferred to an acute in-patient rehabilitation center where he was admitted for an additional twenty days, and underwent physical, occupational, and speech therapy.

200.    Mickey slowly regained some function in his left leg that eventually allowed him to ambulate with a significant limp and limited mobility.

201.    Mickey was not able to start walking until the last week of his acute rehabilitation program.

202.    Mickey never regained strength in his left upper extremity after his stroke.

203.    The problems with Mickey's vision slowly improved, but he never regained full vision again.

204.    Upon information and belief, Mickey would not have suffered as large of a hematoma, a smaller amount of blood would have collected in his brain, and the blood would not have clotted if Officer Bourdon had provided Mickey timely access to emergency medical care.

205.    Upon information and belief, a smaller hematoma that did not begin to clot would have caused less permanent damage to Mickey's brain.

206.    Upon information and belief, a timely medical evaluation and prompt medical treatment would have prevented or lessened the severe permanent disability that Mickey continues to suffer including, impaired mobility, vision deficits, and paralysis of his left arm.

207.    Mickey has suffered and continues to suffer from depression and suicidal thoughts since his interaction with Officer Bourdon and the Lakewood Police.

208.    Mickey experiences severe anxiety and panic whenever he is around police officers.

209.    Mickey has never been able to resume work after the stroke he suffered causing him severe financial strain.

210.    Mickey has never been able to resume bowling.

211.    Eventually Mickey was awarded Social Security Disability Benefits in November 2024 for his serious disabilities that prevent his ability to work.

***Mickey does not learn of Officer Bourdon's and the City of Lakewood's violations until April 25, 2023.***

212.    After Mickey secured legal representation form the Colorado Public Defender's office to defend against the criminal charges against him on or around March 8, 2023, he did not meet with his public defender until on or around April 25, 2023.

213.    Up until that meeting, Mickey remembered only that he had contact with police officers the night of his stroke, but nothing more about the details of who contacted him, how he was treated, or any delay caused by the officers who contacted him.

214.    Mickey did not learn of how Officers Bourdon and Prien treated him and the delay they caused in his access to medical care until he watched the body-worn camera footage of the incident.

215.    Mickey was first provided access to the body-worn camera footage on April 25, 2023.

216.    Mickey watched the footage with his mother Johnnie after that date, and they both observed for the first time, the violations of Officer Bourdon and the City of Lakewood.

217.    After observing the video and understanding what had happened to him during the contact with the Lakewood Police officers and how they treated him, Mickey diligent pursued legal counsel to evaluate whether he would pursue civil claims against them.

218.    Mickey contacted dozens of attorneys throughout 2023 and 2024, all while continuing to defend his innocence in the underlying criminal proceeding.

## CLAIMS FOR RELIEF
### COUNT ONE
**42 U.S.C. § 1983 – Violation of Fourteenth Amendment**
**Deliberate Indifference to Serious Medical Need**
**Against Defendant Haley Bourdon**

219.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

220.    At all relevant times hereto, Officer Bourdon was acting under the color of state law in her capacity as a Lakewood Police Officer.

221.    Upon information and belief, Officer Bourdon had primary decision-making authority over Mickey's arrest, placement, and access to medical care.

222.    At the time when Defendant Bourdon arrested Mickey, Mickey had a clearly established constitutional right under the Fourteenth Amendment to the United States Constitution to adequate and timely medical care for serious medical needs.

223.    Any reasonable law enforcement officer, including Officer Bourdon, was on notice and knew or should have known of this clearly established right.

224.    Mickey's severe hemorrhagic stroke was an objectively serious medical need that was obvious based on the textbook stroke symptoms he exhibited and that Officer Bourdon observed, including, but not limited to a severe headache, complete paralysis of the left side of his

body, slurred and delayed speech, loss of balance, inability to walk without a severe left-sided limp, left-sided facial drooping, drooling out of his mouth, and mental confusion.

225.    Officer Bourdon deliberately and unreasonably ignored the substantial risk of harm to Mickey's health caused by delayed medical intervention to his serious medical need when she:

    (1) failed to transport Mickey to a hospital for emergency medical treatment upon contacting him and observing symptoms consistent with a medical emergency and entirely inconsistent with a person who had taken two shots of alcohol and smoke marijuana hours earlier,

    (2) failed to perform a breath-test on Mickey to confirm if he was intoxicated or not upon contacting him,

    (3) refused to transport Mickey to a hospital for emergency medical treatment after Officer Prien indicated that Mickey should immediately be taken to a hospital, instead insisting that he be taken to the fire station for a blood draw to support the DUI charge against him,

    (4) did not act with any urgency when transporting Mickey to the fire station,

    (5) refused to act with any urgency to have Mickey evaluated by the firefighter paramedics upon their arrival at the fire station,

    (6) did not inform the paramedics about the breadth and severity of Mickey's symptoms he had exhibited when she first contacted him,

    (7) did not act with any urgency when transporting Mickey to the hospital after a sample of his blood was collected at the fire station,

(8) did not act with any urgency upon her arrival at the hospital to have Mickey evaluated by medical providers, and

(9) refused to correct Officer Prien's erroneous and suspect account of the timing and severity of Mickey's symptoms to the medical providers at the hospital.

226.    Through the above failures, Officer Bourdon unconstitutionally denied Mickey prompt and adequate medical care which would have prevented hours of pain, suffering, confusion, and embarrassment.

227.    Any reasonable officer in Officer Bourdon's position would have recognized and appreciated the risk of disregarding Mickey's serious medical need, and acted differently than she did in light of this risk.

228.    Upon information and belief, through the above failures, Officer Bourdon caused Mickey to suffer more severe brain damage and permanent disability than if she had timely provided him access to emergency medical care.

229.    Officer Bourdon's failures were undertaken intentionally, maliciously, willfully, wantonly, unreasonably, and/or in reckless disregard of Mickey's federally protected rights.

230.    Upon information and belief, the acts or omissions of Officer Bourdon were the moving force behind and proximate cause of Mickey's injuries.

231.    Officer Bourdon's failures deprived Mickey of the rights, privileges, liberties, and immunities secured by the United States Constitution.

232.    Officer Bourdon's failures caused Mickey physical injury, pain, suffering, embarrassment, emotional harm, financial loss, among other injuries, damages and losses.

**COUNT TWO**
**§ 13-21-131, C.R.S. - Colo. Const. Art. II, Section 20 and 25**

**Deliberate Indifference to Serious Medical Need**
**Against Defendant Haley Bourdon**

233.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

234.    At all relevant times hereto, Officer Bourdon was acting under the color of state law in her capacity as a Lakewood Police Officer.

235.    Upon information and belief, Officer Bourdon had primary decision-making authority over Mickey's arrest, placement, and access to medical care.

236.    Mickey's severe hemorrhagic stroke was an objectively serious medical need that was obvious based on the textbook stroke symptoms he exhibited and that Officer Bourdon observed, including, but not limited to: a severe headache, complete paralysis of the left side of his body, slurred and delayed speech, loss of balance, inability to walk without a severe left-sided limp, left-sided facial drooping, drooling out of his mouth, and mental confusion.

237.    Officer Bourdon deliberately and unreasonably ignored the substantial risk of harm to Mickey's health caused by delayed medical intervention to his serious medical need when she:

(1) failed to transport Mickey to a hospital for emergency medical treatment upon contacting him and observing symptoms consistent with a medical emergency and entirely inconsistent with a person who had taken two shots of alcohol and smoke marijuana hours earlier,

(2) failed to perform a breath-test on Mickey to confirm if he was intoxicated or not upon contacting him,

(3) refused to transport Mickey to a hospital for emergency medical treatment after Officer Prien indicated that Mickey should immediately be taken to a hospital,

instead insisting that he be taken to the fire station for a blood draw to support the DUI charge against him,

(4) did not act with any urgency when transporting Mickey to the fire station,

(5) refused to act with any urgency to have Mickey evaluated by the firefighter paramedics upon their arrival at the fire station,

(6) did not inform the paramedics about the breadth and severity of Mickey's symptoms he had exhibited when she first contacted him,

(7) did not act with any urgency when transporting Mickey to the hospital after a sample of his blood was collected at the fire station,

(8) did not act with any urgency upon her arrival at the hospital to have Mickey evaluated by medical providers, and

(9) refused to correct Officer Prien's erroneous and suspect account of the timing and severity of Mickey's symptoms to the medical providers at the hospital.

238.    Through the above failures, Officer Bourdon unconstitutionally denied Mickey prompt and adequate medical care which would have prevented hours of pain, suffering, confusion, and embarrassment.

239.    Upon information and belief, through the above failures, Officer Bourdon caused Mickey to suffer more severe brain damage and permanent disability than if she had timely provided him access to emergency medical care.

240.    Any reasonable officer in Officer Bourdon's position would have recognized and appreciated the risk of disregarding Mickey's serious medical need, and acted differently than she did in light of this risk.

241.    Officer Bourdon's failures were undertaken intentionally, maliciously, willfully, wantonly, unreasonably, and/or in reckless disregard of Mickey's federally protected rights.

242.    Upon information and belief, the acts or omissions of Officer Bourdon were the moving force behind and proximate cause of Mickey's injuries.

243.    Officer Bourdon's failures deprived Mickey of the rights, privileges, liberties, and immunities secured by the United States Constitution.

244.    Officer Bourdon's failures caused Mickey physical injury, pain, suffering, embarrassment, emotional harm, financial loss, among other injuries, damages and losses.

**COUNT THREE**
**Title II of the Americans with Disabilities Act ("ADA") – 42 U.S.C. § 12132**
**Disability Discrimination**
**Against Defendant City of Lakewood, Colorado**

245.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

246.    The severe hemorrhagic stroke Mickey suffered immediately disabled him and prevented him from performing several major life activities including walking, speaking, and thinking.

247.    At all times relevant to his allegations in this Complaint, Mickey met the essential eligibility requirements for the receipt of services from the City of Lakewood's Police Department.

248.    Those services included, but were not limited to, protection and service, arrests, post-arrest transportation, and facilitating adequate access to medical care.

249.    The City of Lakewood knew and had notice of Mickey's disability and his need for reasonable modifications because Officers Bourdon and Prien observed the textbook stroke symptoms that Mickey exhibited including, but not limited to: a severe headache, complete

paralysis of the left side of his body, slurred and delayed speech, loss of balance, inability to walk
without a severe left-sided limp, left-sided facial drooping, drooling out of his mouth, and mental
confusion.

250.    The City of Lakewood intentionally discriminated against Mickey on the basis of
his disability when its officers repeatedly insulted and mocked Mickey, referred to him as a
"zombie", and announced loudly and publicly in front of others that he was "zombie" all while he
was suffering a severe hemorrhagic stroke and had complete left-sided paralysis.

251.    The City of Lakewood denied Mickey the benefits of its services and programs and
failed to provide Mickey reasonable modifications of its programs necessary to avoid
discrimination on the basis of disability when its officers: (1) repeatedly refused to assist Mickey
with buttoning his pants to avoid embarrassment by having his pants fall down around his ankles
countless times during his arrest, transportation, and blood draw, (2) pushed and shoved Mickey
to force him to walk when he exhibited obvious and complete left-sided paralysis, (3) pushed,
shoved, and pulled Mickey in and out of the back seat of a patrol vehicle when he exhibited obvious
and complete left-sided paralysis, and (4) refused to adjust or remove Mickey's handcuffs when
he could not sit comfortably or upright in the back seat of the patrol vehicle because of his obvious
and complete left-sided paralysis.

252.    The reasonable modifications available to the City of Lakewood police officers
included, but were not limited to: (1) helping Mickey button his pants, (2) providing Mickey
mobility assistance including a cane, walker, or wheelchair, (3) providing Mickey appropriate and
safe assistance entering and exiting the back seat of the patrol car, and (4) adjusting or removing
Mickey's handcuffs to allow him to sit comfortably and upright in the back seat of the patrol car.

253.    Had the City of Lakewood police officers made the above reasonable modifications, Mickey could have benefited from the services and programs of the Lakewood Police Department the same way that a non-disabled person would.

254.    As such, the above reasonable modifications available to the City of Lakewood were not fundamental alternations to the nature of its services.

255.    The City of Lakewood knew or should have known that there was a substantial likelihood that failing to modify its programs and services to accommodate Mickey's obvious and apparent disability would result in a violation of his rights and cause him harm, but nonetheless failed to act on that likelihood.

256.    The City of Lakewood's failures were done intentionally and with deliberate indifference to the strong likelihood of violations to Mickey's rights.

257.    The City of Lakewood's failures caused Mickey pain, suffering, embarrassment, and emotional harm, among other injuries, damages and losses.

### COUNT FOUR
### Colorado Anti-Discrimination Act – 24-34-802, C.R.S.
### Disability Discrimination
### Against Defendant City of Lakewood, Colorado

258.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

259.    The severe hemorrhagic stroke Mickey suffered immediately disabled him and prevented him from performing several major life activities including walking, speaking, and thinking.

260.    At all times relevant to his allegations in this Complaint, Mickey met the essential eligibility requirements for the receipt of services from the City of Lakewood's Police Department.

261.    Those services included, but were not limited to, protection and service, arrests, post-arrest transportation, and facilitating adequate access to medical care.

262.    The City of Lakewood knew and had notice of Mickey's disability and his need for reasonable modifications because Officers Bourdon and Prien observed the textbook stroke symptoms that Mickey exhibited including, but not limited to: a severe headache, complete paralysis of the left side of his body, slurred and delayed speech, loss of balance, inability to walk without a severe left-sided limp, left-sided facial drooping, drooling out of his mouth, and mental confusion.

263.    The City of Lakewood intentionally discriminated against Mickey on the basis of his disability when its officers repeatedly insulted and mocked Mickey, referred to him as a "zombie", and announced loudly and publicly in front of others that he was "zombie" all while he was suffering a severe hemorrhagic stroke and had complete left-sided paralysis.

264.    The City of Lakewood denied Mickey the benefits of its services and programs and failed to provide Mickey reasonable modifications of its programs necessary to avoid discrimination on the basis of disability when its officers: (1) repeatedly refused to assist Mickey with buttoning his pants to avoid embarrassment by having his pants fall down around his ankles countless times during his arrest, transportation, and blood draw, (2) pushed and shoved Mickey to force him to walk when he exhibited obvious and complete left-sided paralysis, (3) pushed, shoved, and pulled Mickey in and out of the back seat of a patrol vehicle when he exhibited obvious and complete left-sided paralysis, and (4) refused to adjust or remove Mickey's handcuffs when

he could not sit comfortably or upright in the back seat of the patrol vehicle because of his obvious and complete left-sided paralysis.

265.    The reasonable modifications available to the City of Lakewood police officers included, but were not limited to: (1) helping Mickey button his pants, (2) providing Mickey mobility assistance including a cane, walker, or wheelchair, (3) providing Mickey appropriate and safe assistance entering and exiting the back seat of the patrol car, and (4) adjusting or removing Mickey's handcuffs to allow him to sit comfortably and upright in the back seat of the patrol car.

266.    Had the City of Lakewood police officers made the above reasonable modifications, Mickey could have benefited from the services and programs of the Lakewood Police Department the same way that a non-disabled person would.

267.    As such, the above reasonable modifications available to the City of Lakewood were not fundamental alternations to the nature of its services.

268.    The City of Lakewood knew or should have known that there was a substantial likelihood that failing to modify its programs and services to accommodate Mickey's obvious and apparent disability would result in a violation of his rights and cause him harm, but nonetheless failed to act on that likelihood.

269.    The City of Lakewood's failures were done intentionally and with deliberate indifference to the strong likelihood of violations to Mickey's rights.

270.    The City of Lakewood's failures caused Mickey pain, suffering, embarrassment, and emotional harm, among other injuries, damages and losses.

**RELIEF REQUESTED**

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor and against Defendants, and award all relief as allowed by law and equity, including, but not limited to the following:

(a)     Compensatory damages, including but not limited to those for physical injury, permanent disability, emotional distress, embarrassment, pain and suffering, and financial loss;

(b)     Actual economic and consequential damages;

(c)     Declaratory relief and other appropriate equitable relief;

(d)     Punitive damages as allowed by law;

(e)     Pre-judgment and post-judgment interest at the highest lawful rate;

(f)     Attorneys fees and costs; and

(g)     Such further relief as justice requires.

**PLAINTIFF REQUESTS A TRIAL TO A JURY ON ALL ISSUES SO TRIABLE.**

DATED this 19th day of August, 2025.

Respectfully submitted,

*s/ Aaron Slade*
Aaron Slade, Esq.
NOVO LEGAL GROUP, LLC
4280 Morrison Rd.
Denver, CO 80219
T: 303-335-0250
F: 303-296-4586
E: aslade@novo-legal.com

*Attorney for Plaintiff*